# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CELESTIALRX INVESTMENTS, LLC and KRITTIKA LIFE SCIENCES, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 11733-VCG ) |
| JOSEPH J. KRIVULKA; THE ESTATE OF JOSEPH J. KRIVULKA; MICHAEL J. LERNER, IN HIS CAPACITY AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF JOSEPH J. KRIVULKA; ANGELA L. KRIVULKA, IN HER CAPACITY AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF JOSEPH J. KRIVULKA; LEONARD MAZUR; DONALD OLSEN; JJK PARTNERS, LLC; MIST ACQUISITION, LLC; MIST PHARMACEUTICALS, LLC; MIST PARTNERS, LLC; JAK INVESTMENT PARTNERS, LLC; CRANFORD PHARMACEUTICALS, LLC; CRANFORD THERAPEUTICS, LLC; HOLMDEL PHARMACEUTICALS, LP; HOLMDEL THERAPEUTICS, LLC; LMAZUR ASSOCIATES, JV; AKRIMAX PHARMACEUTICALS, LLC; JOHN DOES 1-10; and ABC ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| and | ) ) |
| AKRIMAX PHARMACEUTICALS, LLC, | ) ) ) |
| Nominal Defendant. | ) |

Date Submitted: December 5, 2018
Date Decided: March 27, 2019

Michael W. McDermott and David B. Anthony, of BERGER HARRIS LLP, Wilmington, Delaware; OF COUNSEL: Benjamin C. Curcio, Paul F. Campano, Jessica A. Tracy, Michael D. Zahler, and Jason S. Haller, of CURCIO MIRZAIAN SIROT LLC, Roseland, New Jersey, *Attorneys for Plaintiffs CelestialRX Investments, LLC and Krittika Life Sciences, LLC*.

Garrett B. Moritz and Benjamin Z. Grossberg, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Andrew E. Anselmi and Zachary D. Wellbrock, of MCCUSKER, ANSELMI, ROSEN & CARVELLI, P.C., Florham Park, New Jersey, *Attorneys for Defendants Joseph J. Krivulka, JJK Partners, LLC, JAK Investment Partners, LLC, Mist Acquisition, LLC, Mist Pharmaceuticals, LLC, Mist Partners, LLC, Cranford Therapeutics, LLC, and Holmdel Therapeutics, LLC*.

Samuel T. Hirzel, II and Aaron M. Nelson, of HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware, *Attorneys for Defendants Leonard Mazur and LMazur Associates, JV*.

Andrew D. Cordo and F. Troupe Mickler IV, of ASHBY & GEDDES, Wilmington, Delaware, *Attorneys for Defendant Donald Olsen*.

Jody C. Barillare, of MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; OF COUNSEL: Brian A. Herman, of MORGAN, LEWIS & BOCKIUS LLP, New York, New York, *Attorneys for Defendant Cranford Pharmaceuticals, LLC*.

Ryan P. Newell and Lauren P. DeLuca, of CONNOLLY GALLAGHER LLP, Wilmington, Delaware, *Attorneys for Defendant Holmdel Pharmaceuticals, LP*.

Phillip A. Rovner and Jonathan A. Choa, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendant Akrimax Pharmaceuticals LLC*.

GLASSCOCK, Vice Chancellor

This Memorandum Opinion represents incremental progress towards resolution of a series of long-ago-filed, potentially case-dispositive motions. This action involves the manner in which the primary Defendant, Joseph Krivulka, is alleged to have used his control over nominal party Akrimax Pharmaceuticals, LLC to benefit other entities (many also parties defendant) in which he was interested, at the expense of Akrimax and its members. In 2016, the Defendants moved to dismiss, and some moved for partial summary judgment as well. I addressed the Motions for Partial Summary Judgment first, in the hope that resolution of issues involving the scope of a release of claims, as well as Krivulka's duties under the LLC agreement, would narrow the issues and promote settlement. That decision ("Celestial I") was issued on January 31, 2017. Since that time, the pace of litigation has been testudinal.

The parties pursued mediation and settlement, unsuccessfully. Unfortunately, Krivulka has died, which led to motion practice regarding what entity or individuals should represent his estate going forward. Eventually, counsel resubmitted the Motions to Dismiss for consideration, bolstered by the parties' years-old briefing. As the caption demonstrates, the case involves a blizzard of Defendant entities, each associated with Krivulka.[1] All have moved to dismiss for failure to state a claim,

---

[1] For cinephiles and those of a certain age, the description of these entities below may invoke the "Hotel Central, Milwaukee" scene from *Key Largo*; nearly all are residents together at "the same address" as Akrimax, in Cranford, New Jersey.

failure of process, failure of service of process, lack of subject matter jurisdiction, or lack of personal jurisdiction. This Memorandum Opinion resolves the latter issues. However, I had asked counsel to address what claims remained in the case in light of my decision in Celestial I.[2] That they have yet, effectively, to do. Accordingly, rather than wade through the morass of 12(b)(6) motions for various entities, some of which may be moot in light of my finding as to the applicable contractual fiduciary duties explained in Celestial I, I find it appropriate to ask the parties, again, to review that decision in light of the claims and inform me which Motions to Dismiss remain. At that point, I will address the remaining Motions under Rule 12(b)(6).[3]

My rationale for those decisions I can economically make follows a statement of the facts, below.

## I. BACKGROUND

The Defendants moved to dismiss all claims brought against them, in part pursuant to Court of Chancery Rule 12(b)(6), failure to state a claim. In a Rule 12(b)(6) motion to dismiss, the Court does not consider documents extrinsic to the complaint, except for documents that are integral to a plaintiff's claim and are

---

[2] *See* Jan. 31, 2018 Status Teleconference Tr., at 18:24–19:22.
[3] As Richard Dreyfuss might say to Bill Murray, "Baby steps, Bob. Baby steps." *See What About Bob?* (Touchstone Pictures 1991).

2

incorporated into the complaint.[4]  The Court assumes as true all well-pleaded allegations of fact in the complaint, and also draws all reasonable inferences from those well-pleaded allegations in favor of the plaintiff.[5]  In this case, certain Defendants, concurrent with their Motions to Dismiss, brought and argued Motions for Partial Summary Judgment.  I have already issued a Memorandum Opinion[6] that addresses the Motions for Partial Summary Judgment, and I made findings of law regarding certain contractual language that are incorporated below.

---

[4] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).  Here, the parties conducted preliminary discovery in preparation for a preliminary injunction hearing.  The Plaintiffs amended their Complaint following that hearing, and explicitly noted that their Amended Complaint "adds facts revealed during preliminary discovery conducted in advance of the February 8, 2016 preliminary injunction hearing." Am. Compl. ¶ 1.  However, not all the preliminary discovery conducted is considered in evaluating the Defendants' Rule 12(b)(6) Motions to Dismiss.  There is no change to the standard that governs the record on which to consider those Rule 12(b)(6) motions; documents integral to a plaintiff's claim and incorporated into the complaint can be considered, even if extrinsic to the complaint.  *See In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 658 n.3 (Del. Ch. July 23, 2013) (explaining why depositions taken as part of discovery were considered fully incorporated into the complaint).  Here, that means that certain agreements, which were produced in preliminary discovery and/or submitted by affidavit accompanying the Defendants' Motions to Dismiss and Motions for Partial Summary Judgment as well as affidavits accompanying the Plaintiffs' responsive briefing to those Motions, have been considered.  These agreements, or the relationships they govern, are referenced in the Amended Complaint.  Information gleaned from these agreements has served to describe certain relationships with greater specificity, but has otherwise had a nominal bearing on the outcome.

[5] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[6] *See CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990 (Del. Ch. Jan. 31, 2017).

3

*A. The Parties*

As this action involves a multitude of parties, it is beneficial (consistent with my practice in Celestial I)[7] to first delineate the various parties, especially because many are interrelated.

### 1. The Plaintiffs

Plaintiff CelestialRX Investments, LLC ("CelestialRX") is a Delaware limited liability company with a principal place of business in Old Greenwich, Connecticut.[8] CelestialRX is a member of Defendant Akrimax Pharmaceuticals, LLC ("Akrimax").[9] CelestialRX's sole member and manager is Sandeep "Steve" Laumas ("Laumas").[10] From January 11, 2008 to July 1, 2013, Laumas served on Akrimax's Board of Directors.[11]

Plaintiff Krittika Life Sciences, LLC ("Krittika") is also a Delaware limited liability company and shares its principal place of business with CelestialRX in Old Greenwich, Connecticut.[12] As with CelestialRX, Krittika's sole member and

---

[7] Diligent readers may notice that I, at times, borrow the phrasing from my previous Memorandum Opinion when describing the parties.
[8] Am. Compl. ¶ 4.
[9] *Id*.
[10] *Id.*
[11] *Id.* ¶¶ 32, 33, 77.
[12] *Id.* ¶ 5.

manager is Laumas.[13]  Krittika entered into a consulting agreement with Defendant

Akrimax dated February 1, 2008.[14]

### 2. The Defendants

#### a. Nominal Defendant/Defendant

Defendant Akrimax is a Delaware limited liability company with a principal

place of business in Cranford, New Jersey.[15]  Akrimax acquires, develops, sells, and

markets "pharmaceutical products in the areas of cardiovascular medicine,

endocrinology[,] and pain management."[16]  Akrimax was formed on October 24,

2007, and Defendants Joseph Krivulka and Leonard Mazur were its initial

members.[17]  Plaintiff CelestialRX subsequently joined as the third member.[18]

Akrimax is a nominal defendant for the purposes of CelestialRX's derivative claims,

but a defendant in Krittika's claim for breach of contract.[19]

#### b. Individual Defendants

Joseph J. Krivulka ("Krivulka") was[20] a resident of New Jersey and an

investor in numerous pharmaceutical businesses, which are defendants in this

---

[13] *Id.*

[14] *Id.* ¶ 45.

[15] *Id.* ¶ 6.

[16] *Id.* ¶ 28.

[17] *Id.*

[18] *Id.*

[19] *Id.* ¶ 6.

[20] Krivulka is now deceased. *See* Docket Item [hereinafter, "D.I."] 278, Suggestion of Death Upon the Record of Joseph J. Krivulka.  Krivulka has been substituted in this action by the Estate of Joseph J. Krivulka, and Michael J. Lerner and Angela L. Krivulka in their capacity as the personal

action.[21] Krivulka was an original member of Defendant Akrimax. Prior to July 1, 2013, Krivulka served as one of three directors on Akrimax's Board of Directors, which acting collectively managed Akrimax.[22] Following a July 1, 2013 amendment to Akrimax's operating agreement, Krivulka, individually, became the sole manager of Akrimax.[23] Pursuant to the same amendment, Krivulka became the beneficial owner of all of Akrimax's Common Voting Units and fifty-one percent of Akrimax's total units (or "Krivulka Units").[24] Apart from Akrimax, Krivulka also held, directly or beneficially, majority ownership interests in Defendants Mist Acquisition, LLC, Mist Pharmaceuticals, LLC, Mist Partners, LLC, JJK Partners, LLC, JAK Investment Partners, LLC, Holmdel Therapeutics, LLC, and Cranford Therapeutics, LLC.[25] Krivulka passed away during the pendency of this litigation, and his Estate and two individuals in their capacity as personal representatives of his Estate were named Defendants in his stead,[26] references in this Memorandum Opinion to "Krivulka" refer to Mr. Krivulka, or to his successors, as context dictates.

---

representatives of the Estate of Joseph J. Krivulka. *See* D.I. 304, Order Granting Plaintiffs' Motion to Substitute Pursuant to Court of Chancery Rule 25.

[21] Am. Compl. ¶ 7.

[22] *Id.* ¶¶ 33, 77.

[23] *Id.* ¶ 77.

[24] *Id.*

[25] *Id.* ¶¶ 7, 11–18. Through his ownership interest in Cranford Therapeutics, LLC, Krivulka is a minority equity holder in Cranford Pharmaceuticals, LLC. *See* Am. Compl. ¶ 96; *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *2 n.16 (Del. Ch. Jan. 31, 2017). Similarly, through his equity interest in Holmdel Therapeutics, LLC, Krivulka is a minority equity holder in Holmdel Pharmaceuticals, LP. *See* Am. Compl. ¶ 98; *CelestialRX*, 2017 WL 416990, at *2 n.16.

[26] D.I. 304.

6

Defendant Leonard Mazur ("Mazur") is a resident of New Jersey and an initial member of Akrimax.[27] Between January 11, 2008 and July 1, 2013, Mazur served on Akrimax's Board of Directors, along with Krivulka and Laumas.[28] Mazur, like Krivulka, has various investments outside his interest in Akrimax.[29] Mazur's interests, direct and beneficial, include minority ownership interests in Defendants Mist Acquisition, LLC, Mist Partners, LLC, Holmdel Therapeutics, LLC and Cranford Therapeutics, LLC;[30] all entities in which Krivulka also has a majority ownership interest. Mazur also holds ownership interests in Prenzamax, LLC, Citius Pharmaceuticals, LLC, and Valencia Investment Partners, LLC.[31] Finally, Mazur manages Defendant LMazur Associates JV ("LMazur Associates").[32]

Defendant Donald Olsen ("Olsen") is a resident of California.[33] Olsen is the former President and CEO of Akrimax.[34] Olsen holds a minority ownership interest in Defendants Cranford Therapeutics, LLC and Holmdel Therapeutics, LLC.[35]

---

[27] Am. Compl. ¶¶ 8, 28.
[28] *Id.* ¶¶ 33, 77.
[29] *Id.* ¶ 8.
[30] *Id.* ¶¶ 8, 14–18. As with Krivulka, Mazur has an ownership interest in Cranford Pharmaceuticals and Holmdel Pharmaceuticals through his interests in Cranford Therapeutics and Holmdel Therapeutics, respectively.
[31] *Id.* ¶ 8. These entities have contractual relationships with Akrimax but are not defendants in this action, and the Plaintiffs make no allegations linking these entities to the claims in the Amended Complaint. *See id.* ¶ 59.
[32] *Id.* ¶ 21.
[33] *Id.* ¶ 9.
[34] *Id.*
[35] *Id.* As with Krivulka and Mazur, Olsen also has an ownership interest in Cranford Pharmaceuticals and Holmdel Pharmaceuticals through his interests in Cranford Therapeutics and Holmdel Therapeutics, respectively. *Id.* ¶¶ 17–20.

7

### c. The Entity Defendants

Defendant JJK Partners, LLC ("JJK Partners") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[36] JJK Partners was formed on March 3, 2008, Krivulka is its sole member.[37] JJK Partners entered into a consulting agreement with Akrimax dated February 1, 2008.[38] Following a July 1, 2013 amendment to Akrimax's operating agreement, JJK Partners holds all the voting rights in Akrimax and all the "Krivulka Units" in Akrimax;[39] prior to the amendment, Krivulka held his interests in Akrimax in his own name.[40] Apart from Akrimax, JJK Partners holds majority ownership interests in Defendants Cranford Therapeutics, LLC and Holmdel Therapeutics, LLC.[41]

Defendant JAK Investment Partners, LLC ("JAK Investment Partners") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[42] JAK Investment Partners was formed in

---

[36] *Id.* ¶ 11.

[37] *Id.*

[38] *Id.* ¶ 45. The inconsistency between formation date, March 1, 2008, and the date of the consulting agreement, February 1, 2008, is reflective of the Amended Complaint and is not an error of the Court.

[39] *Id.* ¶¶ 8, 77.

[40] See Transmittal Aff. of Michael D. Zahler In Support of Pls.' Opp'n to the Krivulka and Mazur Defs.' Mots. for Partial Summ. J. and to All Defs.' Mots. to Dismiss [hereinafter, "Zahler Aff."] Ex. 2 (Amended and Restated Limited Liability Company Agreement of Akrimax Pharmaceuticals, LLC), at Subex. A; Ex. 3 (Second Amended and Restated Limited Liability Company Agreement of Akrimax Pharmaceuticals, LLC), at Subex. A.

[41] Am. Compl. ¶ 46 n.1.; Zahler Aff. Ex. 19, at Subex. B; Transmittal Aff. of John A. Eakins, Esq., in Support of Krivulka Defs.' Mots. for Summ. J. and to Dismiss [hereinafter, "Eakins Aff."] Ex. 24, at Subex. B.

[42] Am. Compl. ¶ 12.

8

September 2008, and Krivulka is its sole member.[43]  JAK Investment Partners holds a majority ownership interest in Defendant Mist Partners, LLC.[44]

Defendant Mist Partners, LLC ("Mist Partners") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[45]  Mist Partners was formed in October 2009.[46]  As previously mentioned, JAK Investment Partners holds a majority ownership interest in Mist Partners; prior to July 30, 2015, JJK Partners held the same majority ownership interest in Mist Partners.[47]  Defendant LMazur Associates holds a minority ownership interest in Mist Partners.[48]  Mist Partners is the sole owner and member of Defendant Mist Acquisition, LLC.[49]

Defendant Mist Acquisition, LLC ("Mist Acquisition") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[50]  Mist Acquisition was formed in October 2009.[51]  As stated above, Mist Acquisition is wholly owned by Mist Partners.

---

[43] *Id.*
[44] *Id.* ¶ 14.
[45] *Id.*
[46] *Id.*
[47] *Id.* ¶¶ 14, 46 n.1.
[48] *Id.* ¶ 14.
[49] *Id.*
[50] *Id.* ¶ 15.
[51] *Id.*

Defendant Mist Pharmaceuticals, LLC ("Mist Pharmaceuticals") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[52] Mist Pharmaceuticals was formed in October 2009.[53] Krivulka has an over ninety percent interest in Mist Pharmaceuticals and was Chairman of its Board of Directors.[54]

Defendant Cranford Therapeutics, LLC ("Cranford Therapeutics") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[55] Cranford Therapeutics was formed in October 2013.[56] JJK Partners holds a majority ownership interest in Cranford Therapeutics, and Krivulka serves as Cranford Therapeutics' Chairman of the Board of Directors.[57] Defendants LMazur Associates and Olsen also hold minority ownership interests in Cranford Therapeutics.[58] Cranford Therapeutics is a member of Defendant Cranford Pharmaceuticals, LLC, in which it owns a minority interest of approximately twelve percent.[59]

Defendant Cranford Pharmaceuticals, LLC ("Cranford Pharmaceuticals") is a Delaware limited liability company, with the same principal place of business as

---

[52] *Id.* ¶ 16.
[53] *Id.*
[54] *Id.*
[55] *Id.* ¶ 17.
[56] *Id.*
[57] *Id.* ¶¶ 17, 46 n.1.
[58] *Id.* ¶¶ 17, 46 n.2.
[59] *Id.* ¶ 17; *see also* Eakins Aff. Ex. 58, at Subex. A.

Akrimax in Cranford, New Jersey.[60] Cranford Pharmaceuticals was formed in October 2013, and Krivulka was its CEO.[61] As stated above, Cranford Therapeutics holds a minority interest in Cranford Pharmaceuticals, majority ownership is held by third-party investor JCP II CI AIV, L.P. ("JCP").[62]

Defendant Holmdel Therapeutics, LLC ("Holmdel Therapeutics") is a Delaware limited liability company, with the same principal place of business as Akrimax in Cranford, New Jersey.[63] Holmdel Therapeutics was formed in December 2012, and Krivulka is the Chairman of its Board of Directors.[64] Defendant JJK Partners holds a majority interest, approximately sixty-two percent, in Holmdel Therapeutics; Defendant LMazur Associates holds a twenty-five percent interest, and Defendant Olsen holds a one-half percent interest.[65] Holmdel Therapeutics is a limited partner in Defendant Holmdel Pharmaceuticals, LP, and holds an approximately thirteen percent interest in that entity.[66]

Defendant Holmdel Pharmaceuticals, LP ("Holmdel Pharmaceuticals") is a Delaware domestic limited partnership, with the same principal place of business as

---

[60] *Id.* ¶ 18.
[61] *Id.*
[62] *See CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *4 (Del. Ch. Jan. 31, 2017); *see also* Eakins Aff. Ex. 58.
[63] Am. Compl. ¶ 19.
[64] *Id.*
[65] *Id.* ¶¶ 19, 46 n.1, 46 n.2.
[66] *Id.* ¶ 19.

Akrimax in Cranford, New Jersey.[67]  Holmdel Pharmaceuticals was formed in December 2012.[68]  As stated above, Holmdel Therapeutics is a limited partner and minority owner of Holmdel Pharmaceuticals.  The majority owner and holder of the remaining interest is third-party SWK.[69]

Defendant LMazur Associates JV ("LMazur Associates") is an unincorporated joint venture with a principal place of business in Mountain Lakes, New Jersey.[70]  LMazur Associates is managed by Defendant Mazur.[71]  LMazur Associates entered into a consulting agreement with Akrimax on February 1, 2008.[72]  As stated above, LMazur Associates holds minority ownership interests in Defendants Mist Partners, Cranford Therapeutics, and Holmdel Therapeutics.

### d. Defendant Groups

The Defendants in this action have helpfully formed six groups.  The first group is the "Krivulka Defendants," which consists of the following Defendants: Krivulka, JJK Partners, JAK Investment Partners, Mist Partners, Mist Acquisition, Mist Pharmaceuticals, Cranford Therapeutics, and Holmdel Therapeutics.[73]  The

---

[67] *Id.* ¶ 20.

[68] *See CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *4 (Del. Ch. Jan. 31, 2017); *see also* Eakins Aff. Ex. 25 at Recitals.

[69] *See CelestialRX*, 2017 WL 416990, at *4; *see also* Eakins Aff. Ex. 25 at Partner Schedule.

[70] Am. Compl. ¶ 21.

[71] *Id.*

[72] *Id.* ¶ 45.

[73] The Krivulka Defendants therefore consist of Krivulka (and, currently, his estate), entities that Krivulka wholly and directly owned, and entities in which Krivulka held beneficial majority ownership.

second group is the "Mazur Defendants," which consists of Mazur and LMazur Associates. The other Defendants are grouped individually: Olsen, Cranford Pharmaceuticals, Holmdel Pharmaceuticals, and Akrimax.

## B. Akrimax from Founding to July 1, 2013

### 1. Akrimax is Founded

#### a. Akrimax's Ownership Structure

Akrimax was formed as a Delaware limited liability company by Defendants Krivulka and Mazur on October 24, 2007.[74] Neither individual made an initial capital contribution.[75] Plaintiff CelestialRX became a member of Akrimax on approximately December 1, 2007.[76] Laumas facilitated an investment of $35 million into Akrimax, and in return CelestialRX (which Laumas controlled) was made a member of Akrimax and given voting units.[77] On January 11, 2008, Akrimax amended its governing documents (the "Second Amended LLC Agreement").[78] According to the Second Amended LLC Agreement, CelestialRX owned 49.9% of Common Voting Units; and Krivulka and Mazur each owned 25.5% of Common Voting Units.[79]

---

[74] Am. Compl. ¶ 28.
[75] *Id.* ¶¶ 28, 32.
[76] *Id.* ¶ 31.
[77] *Id.* ¶¶ 31, 32; s*ee also CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *5 (Del. Ch. Jan. 31, 2017) (describing in more detail that Laumas facilitated an investment from a previous employer, an investment fund, which received non-voting preferred units).
[78] Am. Compl. ¶ 32; *id.* Ex. A.
[79] *Id.* ¶ 32; *id.* Ex. A, at Subex. A.

13

### b. Akrimax's Initial Board of Directors

According to the Second Amended LLC Agreement, "the business affairs of [Akrimax] shall be managed by or under the direction of the Manager."[80] The "Manager" of Akrimax was further defined as the "Board of Directors acting collectively."[81] The Agreement specifically named Krivulka, Mazur, and Laumas as the initial directors of Akrimax.[82] According to the Agreement, each director had one vote,[83] and all actions taken by the Board of Directors required approval of a majority of directors.[84] Furthermore, a director acting individually did not have the authority to act for Akrimax.[85]

In terms of fiduciary duties, the Second Amended LLC Agreement provided in Section 4.01(h) that:

> The members of the Board of Directors shall have no fiduciary duties to the Company or the Members and shall not be personally liable to the Company or to its Members for breach of any duty that does not involve (i) an act or omission not in good faith or which involves intentional misconduct or a knowing violation of law; or (ii) a transaction from which such member of the Board of Directors derived an improper personal benefit.[86]

---

[80] *Id.* Ex. A § 4.01(a).
[81] *Id.* ¶ 33; *id.* Ex. A § 4.01(b).
[82] *Id.* ¶ 33; *id.* Ex. A § 4.01(b).
[83] *Id.* ¶ 33; *id.* Ex. A § 4.01(c).
[84] *Id.* ¶ 42; *id.* Ex. A § 4.01(c).
[85] *Id.* ¶ 42; *id.* Ex. A § 4.01(c).
[86] *Id.* ¶ 43; *id.* Ex. A § 4.01(h).

Sections 8.01 and 8.02 of the Second Amended LLC Agreement further provided provisions which governed transactions with interested parties, conflicts of interest, and the ability of members and directors of Akrimax to engage in business opportunities in competition with Akrimax.[87]

The Second Amended LLC Agreement also named Krivulka and Mazur as officers of Akrimax.[88] Specifically, Krivulka was Chairman and Mazur was Vice Chairman.[89] According to the Agreement, officers "are not 'managers' (within the meaning of the Act) of [Akrimax], but the Manager may delegate to such Officers such power and authority as the Manager deems advisable."[90]

### c. Akrimax Enters into Consulting Agreements with Krittika, LMazur Associates, and JJK Partners

In the spring of 2008, Akrimax entered into consulting agreements with JJK Partners, LMazur Associates and Krittika.[91] These agreements were dated February 1, 2008.[92] The agreements provided that Akrimax would pay each entity two percent of Akrimax's gross revenues.[93] The agreements also included covenants not to

---

[87] *Id.* Ex. A §§ 8.01, 8.02.

[88] *Id.* ¶ 44.

[89] *Id.* Ex. A § 4.03(a).

[90] *Id.* The "Act" is defined as the Delaware Limited Liability Company Act. *See id.* Ex. A, at Recitals.

[91] *Id.* ¶ 45.

[92] *Id.* The inconsistency between the time of contracting and the dates of the consulting agreements is not an error of the Court.

[93] *See* Eakins Aff. Ex. 6 (Consulting agreement with JJK Partners); Zahler Aff. Exs. 23 (Consulting Agreement with Krittika), 24 (Consulting Agreement with LMazur Associates).

compete. As a result, JJK Partners and LMazur Associates were prohibited from competing with Akrimax and from directly or indirectly owning an interest in any entity that competes with Akrimax.[94]

### 2. Rouses Point Manufacturing Facility and the Inderal License[95]

On January 11, 2008, Akrimax purchased a manufacturing facility in Rouses Point, New York from Wyeth Pharmaceuticals ("Wyeth") for $20 million.[96] In another agreement executed on the same day, Akrimax purchased the rights to the pharmaceutical Inderal, and certain other drugs, from Wyeth for $12 million.[97]

### 3. The Tirosint Sublicense

On January 27, 2010, Akrimax and Alpharma Pharmaceuticals, LLC ("Alpharma") entered into an exclusive sublicense agreement (the "Alpharma Agreement") for Akrimax to acquire the sublicense to the pharmaceutical Tirosint.[98] Alpharma had previously acquired the exclusive license to distribute and sell Tirosint from Institut Biochimique SA ("IBSA"), the Swiss patent holder of Tirosint.[99] Under the Alpharma Agreement, Alpharma assigned all of its rights

---

[94] Am. Compl. ¶ 47; *see also* Zahler Aff. Exs. 23, 24.

[95] This subsection does not appear in the Amended Complaint but provides helpful background for the reader and was included in my Memorandum Opinion of January 31, 2017 [hereinafter, "Celestial I"].

[96] *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *5 (Del. Ch. Jan. 31, 2017).

[97] *Id.*

[98] Am. Compl. ¶ 35.

[99] *Id.*

under its exclusive license from IBSA to Akrimax.[100] In return, Akrimax agreed to expend certain efforts to distribute Tirosint in the United States; including a minimum amount of expenditures, the purchase of a minimum quantity of Tirosint from IBSA, and the maintenance of a certain level of sales force.[101]

On the same day the Alpharma Agreement was executed, Krivulka, individually and without board approval, caused Akrimax to enter into the "Assignment and Assumption Agreement" with Mist Acquisition.[102] Under the Assignment and Assumption Agreement, Akrimax assigned its Tirosint sublicense to Mist Acquisition.[103]

Almost two years later, on December 1, 2011, Krivulka, individually and again without board approval, caused Akrimax to enter into the "Promotion, Distribution and Support Services Agreement" with Mist Acquisition.[104] The Agreement was purported to be retroactive to January 27, 2010, the original date of the Alpharma Agreement and the subsequent assignment of the Tirosint sublicense from Akrimax to Mist Acquisition.[105] Under the Promotion, Distribution and Support Services Agreement, Mist Acquisition transferred the Tirosint sublicense back to Akrimax; in return, Akrimax assumed all the obligations of the sublicense

---

[100] *Id.*
[101] *Id.*
[102] *Id.* ¶ 54.
[103] *Id.*
[104] *Id.* ¶ 55.
[105] *Id.*

17

and agreed to pay a "distribution fee" of ten percent of gross sales of Tirosint to Mist Acquisition and Mazur.[106] Furthermore, under the Promotion, Distribution and Support Services Agreement, Mist Acquisition could take back the sublicense to Tirosint "for convenience" after thirty days' notice.[107]

Mist Acquisition and Mazur (but not Laumas or CelestialRX) separately entered into a side agreement to split the proceeds of any sale by Mist Acquisition of the Tirosint sublicense.[108]

### 4. The Rights to NitroMist, Suprenza, and Primlev

Prior to 2013, Krivulka also caused Akrimax to enter into contractual relationships with Mist Acquisition and Mist Pharmaceuticals after those two entities obtained the distribution rights to the pharmaceuticals NitroMist, Suprenza,[109] and Primlev.[110] As with Tirosint, Krivulka purported to enter Akrimax into distribution agreements *with Mist Acquisition or Mist Pharmaceuticals* for NitroMist and Primlev without the knowledge or approval of the Akrimax Board of Directors.[111] Under the distribution agreements for NitroMist and Primlev, Akrimax agreed to make royalty payments to Mist Acquisition and Mist Pharmaceuticals, in addition to

---

[106] *Id.*
[107] *Id.*
[108] *Id.* ¶ 57.
[109] Suprenza is briefly mentioned in the Amended Complaint, but no actions or agreements related to Suprenza appear to be at issue in this litigation.
[110] *Id.* ¶ 59.
[111] *Id.*

taking on the obligations that Mist Acquisition and Mist Pharmaceuticals had agreed to when they first obtained the distribution rights from third parties.[112] Furthermore, Akrimax's agreements for the distribution rights to NitroMist and Primlev included provisions for termination at will by Mist Acquisitions and Mist Pharmaceuticals.[113]

### 5. The Pfizer Settlement[114]

After Akrimax purchased the Rouses Point manufacturing facility and distribution rights to Inderal from Wyeth, Pfizer acquired Wyeth.[115] Pfizer alleged that Akrimax had failed to comply with its obligations under the original agreements with Wyeth.[116] Akrimax entered into a settlement with Pfizer to resolve this dispute in 2011.[117] Under the settlement, Akrimax returned the manufacturing facility, and also the rights to Inderal and certain other drugs.[118] However, on the same day, Pfizer and Akrimax entered into a "License and Option Agreement," under which Akrimax could continue selling Inderal into 2013, and would thereafter have the option to extend the license in exchange for a lump sum payment.[119]

---

[112] *Id.*; s*ee also CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *6–7 (Del. Ch. Jan. 31, 2017).

[113] Am. Compl. ¶ 59, 60; *see also CelestialRX*, 2017 WL 416990, at *7–8.

[114] This subsection also does not appear in the Amended Complaint but provides helpful background for the reader and was included in Celestial I.

[115] *CelestialRX*, 2017 WL 416990, at *7.

[116] *Id.*

[117] *Id.*

[118] *Id.* In return, Akrimax was released from certain obligations to Pfizer. *Id.*

[119] *Id.*

6. <u>Termination of the Distribution Rights to Tirosint, NitroMist and Primlev</u>

On April 12, 2013, Mist Acquisition sent a letter to Akrimax purporting to terminate the sublicense agreement for Tirosint; this letter was signed by Krivulka.[120] Mist Acquisition and Mist Pharmaceuticals also purported to terminate their agreements with Akrimax for the distribution rights to NitroMist and Primlev on the same day.[121]

Laumas received a copy of the Mist Acquisition letter regarding Tirosint, and learned for the first time of the assignment of the Tirosint sublicense from Akrimax to Mist Acquisition, and the subsequent re-assignment of the same sublicense back to Akrimax.[122] Krivulka represented to Laumas that Akrimax's financial condition was tenuous, [123] the implication being that Akrimax could not have first acquired the distribution rights to Tirosint and the other drugs on its own, thereby justifying the inclusion of the intermediary entities. As a result, Laumas was shown financial and other information from Akrimax.[124] The financial information provided to Laumas (and CelestialRX) was false and incomplete.[125] Olsen, who was Akrimax's CEO at the time, participated in withholding and concealing correct financial information.[126]

---

[120] Am. Compl. ¶ 60.
[121] *Id.*
[122] *Id.* ¶ 61.
[123] *Id.* ¶ 65.
[124] *Id.*
[125] *Id.* ¶¶ 65, 66.
[126] *Id.* ¶ 65.

20

Akrimax threatened suit against Mist Pharmaceuticals and Mist Acquisitions.[127] Krivulka requested a standstill, and the parties negotiated a settlement for the return of the rights to Tirosint, NitroMist, and Primlev to Akrimax.[128]

*C. The 2013 "Settlement" and Related Agreements*

In broad strokes, under the settlement between the parties, Krivulka agreed to return—or rather have Mist Acquisition and Mist Pharmaceuticals return—the licensing rights to Tirosint and the other drugs to Akrimax.[129] Krivulka further gave assurances that he would make "good faith efforts for Akrimax to sell Tirosint and other product rights at the best possible price,"[130] and that in the meantime, he would maximize the drug assets and avoid default on Akrimax's licensing agreements.[131] In return, Krivulka asked that the royalty rate paid by Akrimax to Mist Acquisition and Mist Pharmaceuticals for Tirosint and the other pharmaceuticals be increased, and that, in the event of a default on the royalty payments, the rights to those pharmaceuticals be returned to Mist Acquisition and Mist Pharmaceuticals.[132]

---

[127] *Id.* ¶ 62.
[128] *Id.* ¶ 63.
[129] *Id.* ¶ 67.
[130] *Id.* ¶ 68.
[131] *Id.*
[132] *Id.* ¶ 67.

Krivulka also wanted Laumas, Mazur, and himself to execute a release of claims.[133] Furthermore, Krivulka wanted changes to Akrimax's ownership and management structure.[134] Laumas assented to these terms, and on July 1, 2013, the settlement was finalized through at least fourteen different agreements.[135]

### 1. The Return of the Rights to Tirosint and the Other Drugs

One of the agreements executed on July 1, 2013 was the Tirosint Termination and Royalty Agreement.[136] Under this Agreement, Akrimax regained the distribution rights to Tirosint and, in return, Akrimax agreed to pay to Mist Acquisition a royalty of thirty-five percent of gross sales of Tirosint;[137] this was an increase from their previous agreement. Additionally, according to the Tirosint Termination and Royalty Agreement, if Akrimax defaulted on the royalty payments and failed to cure the default within forty-five days of notice of default, Mist Acquisition could retake the Tirosint sublicense.[138] Akrimax entered into similar agreements for the return of the rights to NitroMist and Primlev; that is, Akrimax's

---

[133] *Id.*

[134] *Id.* ¶ 72.

[135] *Id.* ¶ 73.

[136] *Id.* ¶ 75.

[137] *Id.* The return of the Tirosint rights was accomplished by the termination of the initial January 27, 2010 assignment of the rights to Tirosint from Akrimax to Mist Acquisition. *See CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *10 (Del. Ch. Jan. 31, 2017).

[138] Am. Compl. ¶ 75.

rights to both drugs were restored, but at increased royalty rates and with royalty default and right reversion provisions.[139]

## 2. The Release Agreement[140]

On July 1, 2013, Krivulka, Mazur, and Laumas also entered into a release agreement (the "Release Agreement"),[141] under which the "Releasing Parties" agreed to release the "Released Parties" from "any and all claims relating to, arising from, or in any way connected to any actions taken by the parties in connection with the company."[142] The Release Agreement is governed by New York law.[143] CelestialRX was not included as a "Party" to the Release Agreement;[144] instead, "Parties" is a defined contractual term that encompasses only Mazur, Laumas, and Krivulka.[145] The Release Agreement defined "Releasing Parties" and "Released Parties" differently; in particular, affiliates of Mazur, Laumas, and Krivulka were defined to be Released Parties but were not Releasing Parties.[146] As a result, CelestialRX, an affiliate of Laumas, is a Released Party but not a Releasing Party,

---

[139] *Id.* ¶ 76.
[140] This was a subject of Celestial I; accordingly, I cite to that Opinion below.
[141] *CelestialRX,* 2017 WL 416990, at *14.
[142] *Id.* (internal quotations omitted).
[143] *Id.* at *13.
[144] *Id.* at *14.
[145] *Id.* at *15.
[146] *Id.*

and therefore, under the Release Agreement *as written*, CelestialRX did not release its claims existing as of July 1, 2013.[147]

### 3. Amendment No. 7 to the Second Amended LLC Agreement

#### a. Ownership and Control

On July 1, 2013, Akrimax amended its operating agreement through Amendment No. 7 to the Second Amended LLC Agreement ("Amendment No. 7"), under this Amendment JJK Partners was given one hundred percent of the voting rights in Akrimax, and Krivulka, indirectly, became the owner of fifty-one percent of total units,[148] also known as "Krivulka Units." Amendment No. 7 stated that these "Krivulka Units" would never decrease below fifty-one percent of total units.[149] Under Amendment No. 7, Mazur lost his voting units; however, his ownership interest increased from 25.5% of common voting units to approximately thirty percent of common non-voting units.[150] On the other hand, according to Amendment No. 7, CelestialRX's ownership interest decreased from forty-nine percent of common voting units to nineteen percent of common non-voting units.[151]

---

[147] *Id.* To be precise, I denied the Defendants' Motions for Partial Summary Judgment that CelestialRX had released claims existing as of July 1, 2013. *Id.* I note that the Defendants argued mutual mistake, an element of an (unpled) reformation claim.

[148] Am. Compl. ¶¶ 73, 77.

[149] *Id.* ¶ 77.

[150] *Id.* ¶ 78.

[151] *Id.* ¶ 79.

Amendment No. 7 also changed the management structure of Akrimax. The Amendment now defined "Manager" as Krivulka alone;[152] previously, "Manager" had been defined as the Board, acting collectively. Furthermore, Krivulka was named in Amendment No. 7 as the sole director of Akrimax.[153] The Amendment did require Krivulka to submit Akrimax's budget to Mazur and Laumas for approval.[154]

### b. Fiduciary Duties[155]

As described above, Amendment No. 7 changed the ownership and management structure in the Second Amended LLC Agreement. Amendment No. 7 also amended Section 4.01(h) of the Second Amended LLC Agreement. That provision now provides that:

> Notwithstanding anything to the contrary in this Agreement, neither the Manager nor any of the members of the Board of Directors nor any Member shall have any fiduciary duties to the Company or the Members or shall be personally liable to the Company or its Members for a breach of any duty that does not involve (i) an act or omission not in good faith or which involves intentional misconduct or a knowing violation of law; or (ii) a transaction from which such Manager, a member of the Board of Directors, or Member derived an improper personal benefit.[156]

---

[152] *Id.* ¶ 77.

[153] *Id.*

[154] *Id.* ¶ 80; *id.* Ex. B § 7.

[155] This was also the subject of Celestial I; accordingly, I cite to that Opinion below.

[156] *Id.* Ex. B § 6.

This language in Amendment No. 7 "generally eliminates common-law fiduciary duties except that it retains liability for intentional or illegal misconduct and other bad faith actions, as well as for improper self-dealing."[157] "[T]hose duties are contractual in nature," although "common law fiduciary duties are instructive in supplying the definition" to undefined terms such as "bad faith."[158]

In turn, Sections 8.01 and 8.02 of the Second Amended LLC Agreement, which were unchanged by Amendment No. 7,[159] "provide specific contractual standards which govern conflict transactions and corporate opportunities."[160] Section 8.02 "eschews the corporate opportunity doctrine, and permits conflicted interests to be held by Directors and Members."[161] Section 8.01 contains two provisions, which provide alternative safe harbors for conflicted transactions.[162] Under Section 8.01(a) a conflicted party bears no liability where a conflicted transaction was entered in the absence of bad faith and the "Manager" determines in good faith that the transaction is fair and reasonable to the Company.[163] Alternatively, under Section 8.01(b), the conflicted party can avoid liability by acting in good faith and resolving its conflict by a good-faith balancing of the relative

---

[157] *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017).
[158] *Id.* at *16.
[159] *See* Am. Compl. Ex. B.
[160] *CelestialRX*, 2017 WL 416990, at *17.
[161] *Id.* at *18.
[162] *Id.*
[163] *Id.* (internal quotations omitted).

26

interests of each party (including its own interest) and the benefits and burdens relating to such interests.[164] Conflicted transactions that do not achieve either safe harbor are therefore transactions from which the conflicted "party may be shown to have derived an improper personal benefit under Section 4.01(h)(ii), in breach of his [contractual] duty under that section."[165]

### 4. Other Relevant Agreements on July 1, 2013

The consulting agreement between Akrimax and Krittika was also amended on July 1, 2013.[166] According to the amendment, Krittika would still be paid a consulting fee equal to two percent of Akrimax's gross sales, but this fee would now be payable quarterly instead of monthly.[167] Relatedly, Amendment No. 7 provided that Krittika's fees would be the first paid from Akrimax's funds available for distribution.[168] Furthermore, Akrimax agreed to pay Krittika arrears on consulting fees that had accrued to approximately $4.7 million.[169] Krittika and Mazur also entered into a related agreement, pursuant to which Mazur agreed to pay Krittika the difference between the actual amount Akrimax paid to Krittika on a quarterly basis and the amount payable to Krittika by Akrimax.[170] Akrimax's consulting

---

[164] *Id.* (internal quotations omitted).
[165] *Id.*
[166] Am. Compl. ¶ 144.
[167] *Id.* ¶¶ 143, 144.
[168] *Id.* Ex. B § 10(i).
[169] *Id.* ¶ 144.
[170] *Id.* ¶ 145.

agreements with JJK Partners and LMazur Associates were also amended on July 1, 2013,[171] but these amendments did not change the prohibition on competing with Akrimax and diverting opportunities from Akrimax.[172]

On July 1, 2013, Krivulka and Mazur also entered into a new side letter agreement.[173] Pursuant to the side letter, Mist Acquisition agreed to pay Mazur twenty-five percent of the Tirosint royalties it received from Akrimax.[174] Additionally, under the side letter, if Mist Acquisition reacquired the Tirosint asset from Akrimax and then sold it, Krivulka and Mazur agreed to split Krivulka's share of the proceeds.[175] On June 28, 2013, prior to the side letter agreement between Krivulka and Mazur, Mazur had agreed to pay Krittika 14.3% of the Tirosint royalties that Mazur received from Mist Acquisition.[176]

*D. Akrimax After the 2013 "Settlement"*

1. <u>Cranford Pharmaceuticals Acquires the Rights to Inderal</u>

In late 2013, Akrimax's license with Pfizer to sell Inderal expired, and Akrimax chose not to exercise its option to repurchase the licensing rights.[177]

---

[171] The amendments to the consulting agreements with JJK Partners and LMazur Associates, similar to the changes to the Krittika consulting agreement, changed the consulting fee payment period from monthly to quarterly and set an amount for arrears on consulting fees owed by Akrimax to JJK Partners and LMazur. *See* Zahler Aff. Exs. 25, 26.

[172] Am. Compl. ¶ 85; s*ee also* Zahler Aff. Exs. 25, 26.

[173] Am. Compl. ¶ 74.

[174] *Id.* ¶¶ 74 n.3, 150.

[175] *Id.* ¶ 74.

[176] *Id.* ¶ 151.

[177] *Id.* ¶ 95.

Cranford Pharmaceuticals, which was formed in October 2013, then acquired the rights to Inderal from Pfizer.[178] Cranford Pharmaceuticals planned to derive a royalty stream from owning the licensing rights to Inderal and to leverage the extended release technology used by Holmdel Pharmaceuticals to create a new Inderal product.[179]

On February 4, 2014, Akrimax entered into agreements with Cranford Pharmaceuticals and Holmdel Pharmaceuticals in furtherance of the plan to create an extended release product based on Inderal.[180] Cranford Therapeutics and JCP had together contributed $25 million in capital to Cranford Pharmaceuticals to fund the purchase of the Inderal rights from Pfizer.[181] Akrimax guaranteed Cranford Therapeutics and JCP's capital contributions to Cranford Pharmaceuticals.[182] Akrimax also assigned to Cranford Pharmaceuticals more than $5.5 million in cash and other assets and agreed to assume Cranford Pharmaceuticals' royalty payments to non-party AstraZeneca.[183] Furthermore, Akrimax agreed to distribute Inderal for Cranford Pharmaceuticals.[184] In return, Cranford Pharmaceuticals agreed to pay Akrimax an "administrative fee" of ten percent of the net sales of Inderal.[185] Under

---

[178] *Id.*
[179] *Id.* ¶¶ 97, 99.
[180] *Id.* ¶¶ 100–105.
[181] *Id.* ¶ 100.
[182] *Id.*
[183] *Id.*
[184] *Id.*
[185] *Id.* ¶ 102.

the agreement between Cranford Pharmaceuticals and Akrimax, Cranford Pharmaceuticals can terminate the agreement for any reason after the first year and after 180 days' notice.[186]

Holmdel Pharmaceuticals licensed its extended release technology to Cranford Pharmaceuticals.[187] As part of the license agreement, Akrimax guaranteed $28.2 million in royalty payments from Cranford Pharmaceuticals to Holmdel Pharmaceuticals.[188]

To date, the "administrative fee" paid to Akrimax based on net sales of Inderal has not exceeded the $5.5 million of assignments to Cranford Pharmaceuticals.[189] Furthermore, since February 4, 2014, Akrimax has paid over $14 million to Holmdel Pharmaceuticals to fulfill its obligation to guarantee royalties owed by Cranford Pharmaceuticals.[190]

### 2. Akrimax Defaults on the Tirosint Royalties to Mist Acquisition

As previously mentioned, under one of the July 1, 2013 agreements, Akrimax regained the sublicense to Tirosint. Akrimax had agreed to pay a higher royalty rate to Mist Acquisition and to return the Tirosint sublicense to Mist Acquisition if it defaulted on those royalty payments. Notwithstanding its contractual obligation to

---

[186] *Id.* ¶ 104.
[187] *Id.* ¶ 100.
[188] *Id.*
[189] *Id.* ¶ 103.
[190] *Id.*

30

do so, Akrimax did not make a royalty payment for Tirosint to Mist Acquisition after October 1, 2013.[191] However, around the same time, Akrimax did decide to assign millions of dollars in assets to Cranford Pharmaceuticals and to guarantee tens of millions of dollars in capital contributions and royalty payments to Cranford Pharmaceuticals and Holmdel Pharmaceuticals.

On February 21, 2014, Mist Acquisition notified Akrimax by letter that Akrimax had breached the July 1, 2013 agreement by defaulting on royalty payments that were due on February 15, 2014.[192] According to the letter, Akrimax had until April 7, 2014 to cure the default or the agreement would be terminated and the rights to Tirosint transferred to Mist Acquisition.[193] Laumas was not aware of this letter at the time it was received by Akrimax.[194] Additionally, despite the requirement in Amendment No. 7 that Laumas receive and approve Akrimax's budget, Laumas was not provided with a copy of Akrimax's 2014 budget.[195]

On November 1, 2014, Akrimax and Mist Acquisition entered into a Termination and Assignment Agreement, under which, based on Akrimax's default, the sublicense to Tirosint and the license to NitroMist reverted back to Mist

---

[191] *Id.* ¶ 87.
[192] *Id.* ¶ 90.
[193] *Id.*
[194] *Id.* ¶ 91.
[195] *Id.* ¶ 89.

31

Acquisition.[196] Despite the termination of the agreement and loss of distribution rights, Akrimax continued to market and distribute Tirosint and NitroMist.[197]

As previously mentioned, the sublicense for Tirosint came from Alpharma, which in turn held an exclusive license from IBSA. On January 14, 2015, Alpharma's exclusive license from IBSA was terminated.[198] On the same day, Mist Acquisition and Akrimax entered into an Exclusive License, Supply and Distribution Agreement with IBSA.[199] Under the Agreement, Mist Acquisition was granted the exclusive license to distribute Tirosint in the United States.[200] Akrimax guaranteed Mist Acquisition's financial and performance obligations to IBSA under this Agreement.[201] Akrimax continued to market and distribute Tirosint without an agreement with Mist Acquisition.[202]

On July 31, 2015, Akrimax entered into the Promotion, Distribution and Support Agreement with Mist Acquisition, under which Mist Acquisition granted Akrimax a sublicense to Tirosint.[203] According to this agreement, Akrimax agreed to make all royalty and other payments that Mist Acquisition was obligated to make

---

[196] *Id.* ¶ 93.
[197] *Id.* ¶ 94.
[198] *Id.* ¶ 111.
[199] *Id.* ¶ 114.
[200] *Id.*
[201] *Id.* ¶ 115.
[202] *Id.* ¶ 117.
[203] *Id.* ¶ 118.

to IBSA.[204]  Additionally, Akrimax agreed to pay Mist Acquisition a "distribution fee" equal to ten percent of the gross sales of Tirosint.[205]  Mist Acquisition can terminate the Agreement "for convenience" after thirty days' notice.[206]  The Agreement was purported to be retroactive to November 1, 2014, the date that Akrimax's previous sublicense for Tirosint was terminated.[207]

Additionally, under the July 31, 2015 agreement for the Tirosint sublicense, Akrimax was obligated to issue over $11 million in promissory notes, the majority of which were payable to JAK Investments and LMazur Associates.[208]  These notes supposedly represented the unpaid "distribution fees" from the agreement with Mist Acquisition that Akrimax had defaulted on, and which had thereby been terminated in November 2014.[209]  The Agreement also imposed on Akrimax the obligation to pay for and provide operating services for Mist Acquisition.[210]

On September 2, 2015, Laumas met with Krivulka and several Akrimax officers to discuss the status of efforts to sell Akrimax's rights to Tirosint.[211]  While Krivulka and Akrimax officers told Laumas that Akrimax would be accepting bids from prospective purchasers, they did not tell Laumas that Mist Acquisition had

---

[204] *Id.* ¶ 119.
[205] *Id.*
[206] *Id.*
[207] *Id.* ¶ 118.
[208] *Id.* ¶ 120.
[209] *Id.*
[210] *Id.* ¶ 121.
[211] *Id.* ¶ 124.

obtained the exclusive license to Tirosint.[212] Krivulka did, however, reveal to Laumas that Akrimax had defaulted on its royalty obligation to Mist Acquisition and that the Tirosint sublicense had reverted to Mist Acquisition.[213] As a result, per Krivulka, Mist Acquisition (and not Akrimax) would therefore be selling the rights to Tirosint.[214] Laumas asked why Akrimax had defaulted on royalty payments to Mist Acquisition and lost the sublicense.[215] In response Krivulka cited excess overhead; in particular, Krivulka cited a Tirosint price increase by IBSA and Akrimax's debt.[216] However, in truth both the price increase and the majority of Akrimax's debt—that is, the promissory notes—occurred after Akrimax defaulted on the Tirosint royalty payments.[217]

During this meeting, Laumas also asked why he had not been provided with Akrimax's budget for 2014, and why Akrimax's default and loss of the Tirosint sublicense were not reflected in the financials that were provided to him.[218] Laumas was not given a response to the former; and regarding the latter, he was told that the sublicense was not considered an asset.[219] Plaintiff CelestialRX filed a Complaint shortly thereafter on November 20, 2015, and also filed a Motion for a Temporary

---

[212] *Id.*
[213] *Id.* ¶ 125.
[214] *Id.*
[215] *Id.* ¶ 126.
[216] *Id.* ¶¶ 126, 127.
[217] *Id.* ¶¶ 126, 127.
[218] *Id.* ¶¶ 129, 130.
[219] *Id.* ¶¶ 129, 130.

Restraining Order ("TRO") in an attempt to prevent the sale of assets, including Tirosint.[220]

### 3. Krittika Is Not Paid Its Consulting Fees

Despite the July 1, 2013 amendment to the consulting agreement between Akrimax and Krittika, Akrimax has withheld over $6 million due to Krittika.[221] During the time Akrimax has withheld payment to Krittika, Akrimax has continued to make payments to JJK Partners and LMazur Associates, pursuant to Akrimax's consulting agreements with those entities.[222] Additionally, despite the side letter agreement between Krittika and Mazur, Mazur has not paid to Krittika the difference between the quarterly amounts actually paid to Krittika by Akrimax, and the amounts payable.[223] Furthermore, despite the June 28, 2013 agreement between Mazur and Krittika, Mazur has never paid Krittika any portion of the Tirosint royalties that Mazur has received from Mist Acquisition.[224]

*E. Procedural History*

Plaintiff CelestialRX filed its verified Complaint on November 20, 2015. I held a hearing on Celestial RX's petition for a Temporary Restraining Order ("TRO") on November 24, 2015, and I subsequently granted the TRO request on

---

[220] *See* D.I. 1.
[221] Am. Compl. ¶ 146.
[222] *Id.* ¶ 148.
[223] *Id.* ¶ 147.
[224] *Id.* ¶ 151.

35

December 3, 2015. The parties then engaged in expedited discovery, followed by Oral Argument on CelestialRX's request for a preliminary injunction on February 8, 2016. I denied CelestialRX's request for a preliminary injunction from the Bench, and CelestialRX filed an Amended Complaint on March 8, 2016. The Amended Complaint added Krittika as a plaintiff, additional Defendants, and additional counts.

At the February 8, 2016 argument for a preliminary injunction, I indicated that, moving forward, two legal issues needed to be decided: first, the effect, if any of the July 1, 2013 Release Agreement, and second, the nature of the duties owed under Akrimax's LLC Agreement. Pursuant to an April 14, 2016 Scheduling Order, the parties were permitted discovery on these two preliminary issues. The Mazur Defendants filed a Motion to Dismiss the Amended Complaint on March 22, 2016.[225] On July 19, 2016, the Krivulka Defendants and Mazur Defendants separately filed Motions for Partial Summary Judgment, and the Krivulka Defendants filed a Motion to Dismiss the Amended Complaint.[226] The Motions for Partial Summary Judgment were based on the two preliminary issues I had identified. On July 5, 2016, Defendant Cranford Pharmaceuticals and Defendant Holmdel Pharmaceuticals also separately filed Motions to Dismiss the Amended

---

[225] Mazur had also filed a Motion to Dismiss the original Complaint on November 24, 2015.
[226] The Krivulka Defendants had also filed a Motion to Dismiss the original Complaint on January 6, 2016.

Complaint. Finally, on July 7, 2016, Defendant Olsen filed a Motion to Dismiss the Amended Complaint.

I heard Oral Argument on all the Defendants' Motions for Partial Summary Judgment and Motions to Dismiss on October 17, 2016, which focused on the two preliminary issues identified. On January 31, 2017, I issued a Memorandum Opinion that addressed only the Defendants' Motions for Partial Summary Judgement, which I granted in part and denied in part. I directed the parties to "confer regarding the most efficient way to move forward in light of [the] Memorandum Opinion."[227] The parties then indicated that they would pursue mediation; however, toward the end of 2017, they reported that the mediation had failed. A scheduling conference was held on January 31, 2018, following which the parties submitted letters on February 7, February 14, and February 22, 2018, indicating that they considered the previously filed Motions to Dismiss to remain pending. [228]

Defendant Krivulka died on February 17, 2018. On April 4, 2018, in light of his passing and given indication from the parties that they were engaging in settlement discussions, I suspended consideration of the then-pending Motions to Dismiss. I later learned that the settlement discussions were not successful. Given

---

[227] *CelestialRX Investments, LLC v. Krivulka*, 2017 WL 416990, at *19 (Del. Ch. Jan. 31, 2017).
[228] The Parties also submitted supplemental letter briefs on the Motions to Dismiss on October 20, 2016.

the death of Krivulka, On May 29, 2018, the Plaintiffs filed a Motion to Substitute, which was promptly opposed. On October 23, 2018, the Plaintiffs represented that the Motions to Dismiss and the Motion to Substitute were once again ripe for adjudication. On November 5, 2018, the parties indicated via letter that no party to the action, despite the more than two years since Oral Argument, sought to file further supplemental briefing on the Motions to Dismiss. I heard Oral Argument on the Motion to Substitute on December 5, 2018, and granted the Motion to Substitute on the same day.[229] Having resolved the Motion to Substitute, I considered the Motions to Dismiss again submitted for decision on December 5, 2018.

## II. ANALYSIS

The Plaintiffs bring sixteen counts against fifteen Defendants (not including ten John Does and ten ABC entities) in their Amended Complaint. In the Amended Complaint, CelestialRX brings against all the Defendants: a direct and derivative claim for Accounting;[230] a direct and derivative claim for Bad Faith Breach of Fiduciary Duty;[231] a derivative claim for Waste;[232] a derivative claim for Conversion;[233] a direct claim for Civil Conspiracy;[234] and a direct and derivative

---

[229] The Motion to Substitute is reflected in the caption of this Opinion and was granted following a short telephonic Oral Argument on the same date, December 5, 2018.

[230] Count I of the Amended Complaint. *See* Am. Compl. ¶¶ 155–160.

[231] Count II of the Amended Complaint. *See id.* ¶¶ 161–171.

[232] Count V of the Amended Complaint. *See id.* ¶¶ 188–192.

[233] Count VII of the Amended Complaint. *See id.* ¶¶ 198–201.

[234] Count IX of the Amended Complaint. *See id.* ¶¶ 214–218.

claim for Unjust Enrichment.[235]  CelestialRX also brings counts against only certain of the Defendants: a direct and derivative claim for Akrimax Officers Breach of Fiduciary Duties against Krivulka, Mazur, and Olsen;[236] a derivative claim for Breach of Restrictive Covenants against Krivulka, JJK Partners, and LMazur Associates;[237] a direct and derivative claim for Aiding and Abetting Breach of Fiduciary Duty against all Defendants, except Krivulka;[238] a direct claim for Fraud/Fraudulent Inducement against Krivulka;[239] a direct claim for Breach of Operating Agreement against Krivulka and Mazur;[240] a direct claim for Breach of Implied Covenant of Good Faith and Fair Dealing against Krivulka and Mazur;[241] seeking Declaratory Judgment against Krivulka, Mazur, and JJK Partners;[242] and a direct claim for "Majority Oppression" against Krivulka, Mazur, and JJK Partners.[243]  Krittika brings a direct claim for Breach of Contract against Akrimax and Mazur[244] and a direct claim for Tortious Interference with Contract against Krivulka.[245]

---

[235] Count XIII of the Amended Complaint. *See id.* ¶¶ 234–237.
[236] Count III of the Amended Complaint. *See id.* ¶¶ 172–176.
[237] Count IV of the Amended Complaint. *See id.* ¶¶ 177–187.
[238] Count VI of the Amended Complaint. *See id.* ¶¶ 193–197.
[239] Count VII of the Amended Complaint. *See id.* ¶¶ 202–213.
[240] Count X of the Amended Complaint. *See id.* ¶¶ 219–222.
[241] Count XI of the Amended Complaint. *See id.* ¶¶ 223–228.
[242] Count XII of the Amended Complaint. *See id.* ¶¶ 229–233.
[243] Count XIV of the Amended Complaint. *See id.* ¶¶ 238–242.
[244] Count XV of the Amended Complaint. *See id.* ¶¶ 243–246.
[245] Count XVI of the Amended Complaint. *See id.* ¶¶ 247–253.

The Krivulka Defendants moved to dismiss all counts brought against them under Rule 12(b)(6), failure to state a claim, except for the breach of restrictive covenant claim, which they moved to dismiss under Rule 12(b)(1), lack of jurisdiction over subject matter.[246]  The Mazur Defendants moved to dismiss all counts brought against them under Rule 12(b)(2), lack of jurisdiction over the person, Rule 12(b)(4), insufficiency of process, Rule 12(b)(5), insufficiency of service of process, and Rule 12(b)(6), failure to state a claim.[247]  Cranford Pharmaceuticals moved to dismiss all claims brought against it under Rule 12(b)(6), failure to state a claim.[248]  Holmdel Pharmaceuticals also moved to dismiss all claims brought against it under Rule 12(b)(6), failure to state a claim.[249]  Finally, Olsen moved to dismiss all claims brought against him under Rule 12(b)(2), lack of jurisdiction over the person, Rule 12(b)(5), insufficiency of service of process, and Rule 12(b)(6), failure to state a claim.[250]

I will first address the subject matter jurisdiction defense to the claim for breach of restrictive covenants.  I then turn to the Mazur Defendants' and Defendant Olsen's Motions to Dismiss on personal jurisdiction, process, and service of process grounds.  In light of my decision here and my previous Memorandum Opinion of

---

[246] D.I. 135, 208.
[247] D.I. 137.
[248] D.I. 192.
[249] D.I. 193.
[250] D.I. 195.

January 31, 2017, the remaining parties shall confer on which Motions to Dismiss still need to be addressed.

### A. *Subject Matter Jurisdiction Over the Consulting Agreements*

Defendants JJK Partners and LMazur Associates[251] argue that Count IV of the Amended Complaint, breach of restrictive covenants, brought derivatively by CelestialRX against them, should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because the claim is subject to arbitration. On a motion to dismiss under Rule 12(b)(1), the plaintiff "bear[s] the burden of establishing subject matter jurisdiction," and "a court may consider documents outside the complaint."[252] Furthermore, "Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate."[253] This Court respects, and will enforce, parties' contractual arbitration commitments.

The restrictive covenants—non-compete clauses—at issue here are contained in consulting agreements that JJK Partners and LMazur Associates entered into separately with Akrimax on February 1, 2008; each consulting agreement was subsequently amended on July 1, 2013. JJK Partners and LMazur Associates argue that the February 1, 2008 consulting agreements contain governing arbitration

---

[251] LMazur Associates joined JJK Partners' argument. *See* Opening Br. in Support of the Mazur Defs.' Mot. to Dismiss Pls.' First Am. Verified Compl. and Mot. for Partial Summ. J., at 14.
[252] *HBMA Hldgs., LLC v. LSF9 Stardust Hldgs. LLC*, 2017 WL 6209594, at *3 (Del. Ch. Dec. 8, 2017).
[253] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007).

clauses. CelestialRX, in turn, contends that the arbitration clauses are superseded by the July 1, 2013 amendments to the consulting agreements.[254] That is to say, CelestialRX does not contest that the parties agreed to binding arbitration clauses in the February 1, 2008 agreements. The Plaintiff's only contention is that the arbitration obligations were terminated via the July 1, 2013 amendments.

In the alternative, CelestialRX proposes that the Court decline to enforce the arbitration clauses here as a matter of judicial policy against dividing disputes.[255] To the extent that CelestialRX argues that judicial efficiency would be better served by declining to honor the arbitration clauses, such an argument is misplaced; again, this Court will respect these parties' contractual obligations.[256] I turn to the language of the consulting agreements and the July 1, 2013 amendments.

JJK Partners' and LMazur Associates' consulting agreements with Akrimax contain identical provisions on governing law and arbitration. According to the initial February 1, 2008 consulting agreements, each agreement "shall be governed by and construed in accordance with the laws of the State of New Jersey . . . except

---

[254] Pls.' Br. in Opp'n to the Krivulka Defs.' Mot. for Partial Summ. J. and Mot. to Dismiss, at 12–13.

[255] *Id.* at 142. While the Plaintiffs address arbitration as it pertains to Plaintiff Krittika's direct claim against Akrimax for breach of the Krittika consulting agreement (Count XV), the Defendants have not moved to dismiss that count on the basis of subject matter jurisdiction, and the Plaintiffs' argument is therefore misplaced.

[256] *See, e.g.*, *Parfi Hldgs. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002) ("When parties to an agreement decide that they will submit their claims to arbitration, Delaware courts strive to honor the reasonable expectations of the parties . . . .").

with respect to matters of law concerning the internal corporate affairs . . . ."[257]

Additionally:

> Notwithstanding anything herein to the contrary, in the event that there shall be a dispute among the parties arising out of or relating to this Agreement, or the breach thereof, the parties agree that such dispute shall be resolved by final and binding arbitration in the State of New York, Borough of Manhattan administered by the American Arbitration Association (the "AAA"), in accordance with AAA's Commercial Arbitration Rules . . . .[258]

The consulting agreements were amended on July 1, 2013; the amendments

provided that:

> The Agreement, amended hereby, shall be construed, governed, interpreted and applied in accordance with the laws in effect in the State of Delaware exclusive of its conflict of laws provisions. Any claim or controversy arising out of or related to this Amendment shall be submitted to a court of applicable jurisdiction in the State of Delaware, and each Party hereby consents to the jurisdiction and venues of such court.[259]

The July 1, 2013 amendments did not alter or amend the non-compete provisions found in the initial February 1, 2008 consulting agreements. Thus, facially at least, it preserved the provision that "[n]otwithstanding anything herein to the contrary," disputes are subject to arbitration.[260] Nonetheless, the Plaintiffs argue that the amendments abrogated the arbitration obligations.

---

[257] Zahler Aff. Ex. 24 ¶ 10(c); Eakins Aff. Ex. 6 ¶ 10(c).
[258] Zahler Aff. Ex. 24 ¶ 10(j); Eakins Aff. Ex. 6 ¶ 10(j).
[259] Zahler Aff. Exs. 25, 26.
[260] Zahler Aff. Ex. 24 ¶ 10(j); Eakins Aff. Ex. 6 ¶ 10(j).

JJK Partners and LMazur Associates argue that the parties consented to the jurisdiction of Delaware only for claims and controversies "arising out of or related to" the July 1, 2013 amendments. Per the Defendants, CelestialRX's derivative claim is for breach of restrictive covenants that were not changed by the amendments, and are therefore subject to arbitration and not to the jurisdiction of Delaware. In the Defendants' view, claims arising from "[t]he Agreement, *amended hereby*"—that is, claims arising from the amendments—are subject to the jurisdiction of Delaware.[261] The restrictive covenants at issue were unchanged by—and in fact, are not referred to in—the amendments, and therefore a claim based on those restrictive covenants arises from the original consulting agreements and not the amendments. As a result, per the Defendants, a claim for breach of those restrictive covenants is subject to the arbitration clause in the original consulting agreements. I find the Defendants' argument colorable in this regard.

As the Plaintiffs point out, judges normally decide questions of arbitrability.[262] Indeed, Delaware law "follows the general rule that 'courts should decide questions of substantive arbitrability.'"[263] An exception exists, however,

---

[261] Zahler Aff. Exs. 25, 26.

[262] Pls.' Br. in Opp'n to the Krivulka Defs.' Mot. for Partial Summ. J. and Mot. to Dismiss, at 142 ("The question of arbitrability is one for a Judge to decide.").

[263] *UPM-Kymmene Corp. v. Renmatix, Inc.*, 2017 WL 4461130, at *4 (Del. Ch. Oct. 6, 2017) (quoting *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006)).

where "the parties clearly and unmistakably provide otherwise."[264] As here, clear and unmistakable evidence is present when an arbitration clause "generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability."[265] The arbitration clauses in the original consulting agreements, quoted above, generally provide for arbitration of all disputes and incorporate AAA rules.[266] As a result, questions of substantive arbitrability here should be decided by the arbitrator. Count IV, the claim for breach of restrictive covenants, is therefore stayed pending the decision of the arbitrator as to arbitrability.

### B. Personal Jurisdiction Over Mazur and LMazur Associates

Defendants Mazur and LMazur Associates moved to dismiss the claims brought against them under Rule 12(b)(2), lack of personal jurisdiction. In a Rule 12(b)(2) motion to dismiss, "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[267] This Court uses a two-step analysis when considering the exercise of personal jurisdiction over a nonresident defendant: first, the Court must determine if a statutory basis for personal

---

[264] *Willie Gary*, 906 A.2d at 79 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

[265] *Id.* at 80 (internal citations omitted).

[266] I need not consider the "additional step" in the *Willie Gary* analysis, as the arbitration clause in question contains no carve-outs or ambiguity as to the disputes covered. *See UPM-Kymmene Corp.*, 2017 WL 4461130, at *4 (discussing *McLaughlin v. McCann*, 942 A.2d 616 (Del. Ch. 2008)).

[267] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

jurisdiction exists, and second, it must determine whether application of jurisdiction over the nonresident would violate "traditional due process notions of fair play and substantial justice."[268] Where, as here, there has been no evidentiary hearing, the plaintiff need only make a *prima facie* showing.[269] The Court "can consider affidavits, briefs of the parties, and the available results of discovery. Still, allegations regarding personal jurisdiction in a complaint are presumed true, unless contradicted by affidavit, and, as with a motion to dismiss under Rule 12(b)(6), the court must construe the record in the light most favorable to the plaintiff."[270]

The Plaintiffs argue that Mazur was a "manager" of Akrimax from January 11, 2008 to July 1, 2013, such that he is subject to the personal jurisdiction of this Court under 6 Del. C. § 18-109(a)(i).[271] The Plaintiffs further argue that after July 1, 2013, he participated materially in the management of Akrimax, such that he is subject to the personal jurisdiction of this Court under 6 Del. C. § 18-109(a)(ii).[272] The Plaintiffs argue that Mazur does business as LMazur Associates, and that jurisdiction over Mazur should extend to LMazur Associates, an unincorporated joint venture.[273] Additionally, the Plaintiffs contend that LMazur Associates

---

[268] *Id.*; *see also Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *6 (Del. Ch. June 15, 2011).
[269] *Hartsel*, 2011 WL 2421003, at *7.
[270] *Id.*
[271] Pls.' Br. in Opp'n to Defs. Olsen's, Mazur's, and LMazur's Mots. to Dismiss and in Opp'n to the Mazur Defs.' Mot. for Partial Summ. J., at 25.
[272] *Id.* at 26.
[273] *Id.* at 27.

consented to the jurisdiction of Delaware Courts in the July 1, 2013 amendment to its consulting agreement with Akrimax.[274] Finally, the Plaintiffs propose that both Mazur and LMazur Associates have waived the defense of lack of personal jurisdiction because they have not shown continuous intent to object to such jurisdiction.[275] I turn first to the issue of waiver, before addressing the personal jurisdiction defenses of Mazur and LMazur Associates.

### 1. Waiver

The Plaintiffs argue that Defendants Mazur and LMazur Associates have waived their right to raise a personal jurisdiction defense. According to Court of Chancery Rule 12(h), a defense of lack of personal jurisdiction is waived if not made in a timely Rule 12 motion or in the first responsive pleading.[276] "The purpose for this rule is to expedite litigation and encourage disputes to be resolved on their merits."[277] Accordingly, a defendant's challenge to personal jurisdiction should be brought at the time he makes his first defensive move.[278] A defendant may waive or abandon its defense of personal jurisdiction when the defendant becomes an "active

---

[274] *Id.*

[275] *Id.* at 28.

[276] *See* Ct. of Ch. R. § 12(h).

[277] *Tuckman v. Aerosonic Corp.*, 394 A.2d 226, 232 (Del. Ch. Sept. 11, 1978) (citations omitted).

[278] *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2010 WL 1838608, at *11 (Del. Ch. Apr. 28, 2010) (citing *Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 987–88 (Del. Super. 2000)).

actor" in the case.[279] In other words, the inquiry of waiver is "whether the defendant has abandoned a solely defensive posture and become an actor in the cause."[280] However, "[t]he entry of a limited appearance by a defendant does not constitute a waiver . . . ."[281] For example, seeking advancement before raising a defense of personal jurisdiction in a timely motion to dismiss is not a waiver of the defense.[282]

The original Complaint named Mazur as a defendant—but not LMazur Associates—and was filed on November 20, 2015. Mazur first filed a Motion to Dismiss, in part under Rule 12(b)(2), four days later, on November 24, 2015.[283] Mazur subsequently participated in the proceedings on the Plaintiffs' Motion for a Temporary Restraining Order and the Plaintiff's Application for Preliminary Injunctive Relief. Mazur submitted himself to a deposition and responded to preliminary discovery. The Plaintiffs contend that Mazur's deposition and participation in discovery constitute a waiver of his personal jurisdiction defense. LMazur Associates was not added as a party until the Plaintiffs filed their Amended Complaint on March 8, 2016. While the Plaintiffs do not directly assert as much, they appear to suggest that LMazur Associates is effectively the same as Mazur and

---

[279] *Id.*; *see also Conn. Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *3 (Del. Ch. Oct. 28, 2011).

[280] *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners*, 2001 WL 1641239, at *6 (Del. Ch. Dec. 4, 2001) (internal citations omitted).

[281] *Gans v. MDR Liquidating Corp.*, 1990 WL 2851, at *4 (Del. Ch. Jan. 10, 1990).

[282] *See Conn. Gen. Life Ins. Co.*, 2011 WL 5222796, at *3.

[283] D.I. 18.

has therefore also waived its personal jurisdiction defense prior to being added as a party.[284]

Mazur and LMazur Associates have not waived their right to raise a personal jurisdiction defense. Mazur asserted such a defense in his first Motion to Dismiss the original complaint, only days after the Complaint was filed. This Court has found that participation in preliminary discovery does not by itself constitute waiver—or, here, abandonment—of a defense of personal jurisdiction.[285] To find otherwise in this case would controvert the purpose of the doctrine recognizing waiver by active participants, and in fact would serve to slow litigation. LMazur Associates was not added as party until the Amended Complaint was filed on March 8, 2016. The Plaintiffs do not argue that LMazur was involved in this litigation previously. Mazur and LMazur Associates promptly asserted a personal jurisdiction defense in their Motion to Dismiss the Amended Complaint on March 22, 2016.[286] Nothing in the behavior of either Defendant comes close, in my mind, to a waiver of the defense of lack of personal jurisdiction.

---

[284] In its waiver section, the Plaintiffs' Opposition Brief only mentions Mazur and does not mention LMazur, although the title to the section refers to "Mazur/LMazur." *See* Pls.' Br. in Opp'n to Defs. Olsen's, Mazur's, and LMazur's Mots. to Dismiss and in Opp'n to the Mazur Defs.' Mot. for Partial Summ. J., at 28.

[285] *See Ross Hldg. & Mgmt. Co. v. Advance Realty Grp.*, LLC, 2010 WL 1838608, at *11 (Del. Ch. Apr. 28, 2010)

[286] D.I. 137.

49

2. Personal Jurisdiction over Defendant Mazur Under 6 Del. C. § 18-109

Under 6 Del. C. § 18-109, Delaware Limited Liability Company Act's implied consent statute:

> A manager . . . of a limited liability company may be served with process . . . in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company . . . , whether or not a manager . . . is a manager . . . at the time suit is commenced.  A manager's . . . serving as such constitutes such person's consent to the appointment of the registered agent of the limited liability company . . . as such person's agent upon whom service of process may be made . . . . Such service as a manager . . . shall signify the consent of such manager . . . that any process when so served shall be of the same legal force and validity as if served upon such manager . . . within the State of Delaware and such appointment of the registered agent . . . shall be irrevocable.[287]

A "manager" refers "(i) to a person who is a manager as defined in § 18-101(10) of this title and (ii) to a person, whether or not a member of a limited liability company, who, although not a manager as defined in § 18-101(10) of this title, participates materially in the management of the limited liability company . . . ."[288] A "manager," as defined by § 18-101(10), is "a person who is named as a manager of a limited liability company in . . . a limited liability company agreement . . . ."[289] Therefore, if Mazur was included in the definition of "manager" in Akrimax's operating agreement or if he participated materially in the management of Akrimax,

---

[287] 6 Del. C. § 18-109(a).
[288] *Id.* § 18-109(a)(i), (ii).
[289] *Id.* § 18-101(10).

then a statutory basis for jurisdiction over Mazur would exist, satisfying the first prong of the two-step analysis.

In terms of the second prong of the analysis, this Court has previously dealt with personal jurisdiction under 6 Del. C. § 18-109, and found that:

> Due process would not be offended if Plaintiffs can show that (1) the allegations against the defendant-manager focus centrally on his rights, duties and obligations as a manager of a Delaware LLC; (2) the resolution of the matter is inextricably bound up in Delaware law; and (3) Delaware has a strong interest in providing a forum for the resolution of the dispute relating to the manager's ability to discharge his managerial functions.[290]

I now apply this two-prong test to Mazur.

### a. Mazur Was A "Manager" of Akrimax Before July 1, 2013, But Not After

According to Akrimax's Second Amended Operating Agreement, Akrimax's "manager" was the "board of directors acting collectively." Mazur was specifically named as an initial member of the Board in the Second Operating Agreement and served as a director until July 1, 2013. As a result, from January 11, 2008 to July 1, 2013, Mazur was a "manager," as defined by 6 Del. C. § 18-101(10), and thereby impliedly consented to Delaware jurisdiction under § 18-109(a)(i) for actions "involving or relating to the business" of Akrimax.[291]

---

[290] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *9 (Del. Ch. June 15, 2011).
[291] *Cf. Fla. R & D Fund Inv'rs, LLC v. Fla. BOCA/Deerfield R & D Inv'rs, LLC*, 2013 WL 4734834, at *7 (Del. Ch. Aug. 30, 2013) ("Therefore, under Section 18–109(a)(i), the [LLC]'s manager is the Board of Directors. Because [the defendant] is not listed in the LLC Agreement as

Following Amendment No. 7 to the Second Amended Operating Agreement on July 1, 2013, Mazur was removed from Akrimax's Board of Directors. The Plaintiffs allege that Mazur retained the title of Vice Chairman, spoke often with Krivulka about Akrimax, and engaged Jeffries to advise regarding sale of Akrimax's assets in 2015.[292] Mazur challenges that this level of involvement rises to the material participation in management required to exert jurisdiction in § 18-109(a)(ii).

Mazur's communication with Krivulka does not by itself rise to material participation. For example, "[t]here is a difference between material participation in managing a company and offering comments via email to one's appointed Board representatives."[293] However, performing actions within the exclusive purview of a manager, such as making an application for dissolution, which by statute "must be made by or for a member or manager," can qualify as material participation.[294] In *Phillips v. Hove*, the defendant, by his own admission, took over day-to-day operations of the LLC, "effectively ran the business [,] . . . [and] later filed a

---

a member of the [LLC]'s Board of Directors, [the defendant] may not be considered a manager of the [LLC] for the purposes of either Section 18–109(a)(i) or Section 18–101(10).").

[292] Pls.' Br. in Opp'n to Defs. Olsen's, Mazur's, and LMazur's Mots. to Dismiss and in Opp'n to the Mazur Defs.' Mot. for Partial Summ. J., at 26.

[293] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *7 (Del. Ch. May 7, 2008).

[294] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *30 (Del. Ch. Jan. 25, 2013).

bankruptcy petition on [the LLC's] behalf."[295]  The Court found that "through these acts, [the defendant] participated materially in the management of [the LLC]."[296]

Performing the tasks of a manager, however, does not equate with "material participation" if that work is done "simply at the direction of and as a representative" of another.[297]  Material participation in the management of an LLC requires "control or [a] decision-making role."[298]  For example, the fact that a defendant negotiates agreements on behalf of an LLC and arranges financing for the LLC is not sufficient to show material participation, when the defendant's power is subject to the control of another.[299]  Here, Amendment No. 7, in explicit terms, put Krivulka solely at the helm of Akrimax on July 1, 2013.  As Mazur points out, the Plaintiffs themselves make the same argument in briefing, where they write that Amendment No. 7 "install[ed] Krivulka as emperor, supreme leader, and dictator for life" and that Krivulka "has absolute control and discretion without expressed limits."[300]  The

---

[295] 2011 WL 4404034, at *22 (Del. Ch. Sept. 22, 2011).

[296] *Id.*

[297] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *7 (Del. Ch. Dec. 1, 2009) (finding assertions that an individual defendant helped form the LLC and issue notes on its behalf did not qualify as material participation because those actions were taken as an employee of a defendant entity, which was the sole member and manager of the LLC).

[298] *In Matter of Dissolution of Arctic Ease, LLC*, 2016 WL 7174668, at *4 (Del. Ch. Dec. 9, 2016) (quoting *Wakely Ltd. v. Ensotran, LLC*, 2014 WL 1116968, at *5 (D. Del. Mar. 18, 2014)); *see also Fla. R & D Fund Inv'rs, LLC v. Fla. BOCA/Deerfield R & D Inv'rs, LLC*, 2013 WL 4734834, at *8 (Del. Ch. Aug. 30, 2013).

[299] *In Matter of Dissolution of Arctic Ease, LLC*, 2016 WL 7174668, at *5.

[300] Reply Br. in Support of the Mazur Defs.' Mot. to Dismiss Pls.' First Am. Verified Compl. and Mot. for Partial Summ. J., at 6 (quoting Pls.' Br. in Opp'n to the Krivulka Defs.' Mot. for Partial Summ. J. and Mot. to Dismiss, at 27, 123).

Plaintiffs' allegations that Mazur retained his title as vice chairman and engaged a banker on behalf of Akrimax are not sufficient to suggest that Mazur materially participated in the management of Akrimax, when Krivulka alone had the authority to manage Akrimax and the Plaintiffs allege that Krivulka asserted this authority.[301] Nothing in those allegations suggests that Mazur acted outside of or usurped Krivulka's control. As a result, Mazur was not a "manager," as defined by 6 Del. C. § 18-109(a)(ii), after July 1, 2013, and statutory implied consent is absent following that date.

### b. Due Process

Mazur agreed to act as a manager of Akrimax from January 11, 2008 to July 1, 2013, with at least constructive notice of Section 18-109(a). The Plaintiffs' claims against Mazur during that time period deal with his duties and obligations as a director and manager of Akrimax. Accordingly, Mazur's due process rights are not offended by this Court's assertion of jurisdiction over him;[302] Mazur does not argue otherwise.

---

[301] Here, I paraphrase Vice Chancellor Montgomery-Reeves in *In Matter of Dissolution of Arctic Ease, LLC*. 2016 WL 7174668, at *5 ("Even taking all reasonable inferences in the Heck Parties' favor, these allegations are not sufficient to suggest that Cohen materially participated in management when Forden alone had the authority to manage Summetria.").

[302] The Plaintiffs' claims against Mazur, at least in part, relate to the internal business of Akrimax, such as whether Mazur violated his fiduciary or contractual duties as a manager or otherwise breached the operating agreement.

### 3. Personal Jurisdiction over LMazur Associates

Defendant LMazur Associates also moved to dismiss all claims against it for lack of personal jurisdiction under Rule 12(b)(2).  The Plaintiffs, in response, argue that personal jurisdiction exists over LMazur Associates as an extension of Mazur, and through LMazur Associates' consulting agreement with Akrimax.  I have discussed the applicable legal standard for Rule 12(b)(2) above, and I therefore proceed directly to its application.

The Plaintiffs contend that personal jurisdiction exists over LMazur Associates as a result of its consulting agreement with Akrimax.  I have discussed that agreement above and determined that the parties consented to jurisdiction in Delaware for claims arising from the amendment.  However, other claims, such as breach of the non-compete covenants, are potentially subject to arbitration in New York.  The Plaintiffs' claims against LMazur Associates, as they relate to the consulting agreement, arise from breaches of the restrictive covenants; these claims have been stayed pending a determination of arbitrability (and, indirectly, my jurisdiction) by the arbitrator.  Therefore, the question of whether LMazur Associates consented to personal jurisdiction in Delaware through the consulting agreement with Akrimax must likewise be stayed.

The Plaintiffs, however, seek to impose jurisdiction on an alternative ground. Defendant LMazur Associates is an unincorporated joint venture, managed by

Mazur, who is a resident of New Jersey.[303]  The Plaintiffs (citing, I note, no authority) contend that if the Court has jurisdiction over Mazur, it has jurisdiction over LMazur Associates.  The Plaintiffs have not plead sufficient facts to demonstrate that LMazur Associates is the alter ego of Mazur.  Simply pleading that an entity has an association with an individual (Mazur) who is subject to jurisdiction is insufficient to show that *the entity* is also subject to jurisdiction.  Therefore, I find that this Court lacks personal jurisdiction over LMazur Associates on the grounds of association with Mazur.  As such, I need not reach LMazur Associate's arguments on service of process.

### 4. Process and Service of Process

Mazur also moved to dismiss the claims brought against him under Rule 12(b)(4), insufficiency of process, and Rule 12(b)(5), insufficiency of service of process.  These motions rest on the premise that Mazur was not a manager of Akrimax; as I have found that the Plaintiffs adequately pled that he *was* a manager until July 1, 2013, these motions are denied.

*C. Personal Jurisdiction over Olsen and Related Service of Process*

Defendant Olsen moved to dismiss the claims brought against him under Rule 12(b)(2), lack of personal jurisdiction, and Rule 12(b)(5), insufficiency of service of

---

[303] I note that it is not clear who owns LMazur Associates, or where it is resident.  At Oral Argument, LMazur's own counsel could only say "I don't believe it was formed under any state's law officially."  Tr. of Oral Argument at 62:1–2.

process. As with Defendant Mazur, the Plaintiffs allege that Olsen meets the definition of "manager" in 6 Del. C. § 18-109, the implied consent statute of the Delaware Limited Liability Company Act, and is therefore subject to this Court's personal jurisdiction. As with the Mazur Defendants, the Plaintiffs argue that, in any case, a personal jurisdiction defense has been waived. I turn first to the issue of waiver.

### 1. Waiver

Olsen was added as a defendant in this action when the Plaintiffs filed their Amended Complaint on March 8, 2016. Olsen filed a Motion to Dismiss on July 7, 2016, where he asserted a personal jurisdiction defense. Prior to being added as a party on March 8, 2016, Olsen was deposed by the Plaintiffs in this action. The Plaintiffs contend that Olsen has therefore "been an interested party for quite some time," and that by not opposing his deposition, Olsen has waived his right to assert a personal jurisdiction defense.[304] This contention is contrary to our case law,[305] and inimical to its rationale; accordingly, I reject the Plaintiffs' argument that Olsen has waived his personal jurisdiction defense.

---

[304] Pls.' Br. in Opp'n to Defs. Olsen's, Mazur's, and LMazur's Mots. to Dismiss and in Opp'n to the Mazur Defs.' Mot. for Partial Summ. J., at 23–24.

[305] *See, e.g.*, *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2010 WL 1838608, at *11 (Del. Ch. Apr. 28, 2010) (finding that participating in motion practice to disqualify plaintiff's counsel and engaging in discovery are not enough to constitute active involvement such that a personal jurisdiction defense is waived).

## 2. Personal Jurisdiction Over Olsen Under 6 Del. C. §18-109

Having found that Olsen did not waive his personal jurisdiction defense, I turn to his Motion to Dismiss pursuant to Rule 12(b)(2). As I have covered the legal standard for Rule 12(b)(2) and its interaction with 6 Del. C. § 18-109 above, I will not repeat it and will instead proceed to apply the legal analysis to Olsen.

Olsen served as President and CEO of Akrimax from July 2011 until October 2015.[306] According to the Plaintiffs, Olsen was hired to manage Akrimax's sales and marketing, and as President and CEO of Akrimax, Olsen was further involved in product acquisition and the development of an annual business plan, and he "had the authority to write checks, approve wire transfers, execute promissory notes, and bind Akrimax to contracts."[307] The Plaintiffs also claim that Olsen was responsible for "repairing" Akrimax's relationship with Pfizer.[308] As such, per the Plaintiffs, Olsen had a role in day-to-day operations.[309] Olsen contends that, even if true, all the cited activity does not support "material participation in the management" of Akrimax, such that Olsen would be a "manager" under 6 Del. C. § 18-109. In addition, the Plaintiffs allege that in 2013 Olsen was involved first in denying

---

[306] Am. Compl. ¶ 9; Opening Br. in Support of Def. Olsen's Mot. to Dismiss the First Am. Verified Compl., at 2.

[307] Pls.' Br. in Opp'n to Defs. Olsen's, Mazur's, and LMazur's Mots. to Dismiss and in Opp'n to the Mazur Defs.' Mot. for Partial Summ. J., at 19.

[308] *Id.* As previously described, Akrimax's Second Amended LLC Agreement specifically stated that officers of Akrimax are not managers.

[309] *Id.* at 21.

Laumas any financial information and then providing Laumas with misleading information,[310] and that Olsen later executed the agreements between Cranford Pharmaceutical, Holmdel Pharmaceuticals, and Akrimax.[311] Nonetheless (setting aside the waiver theory) the Plaintiffs assert no grounds for this Court's jurisdiction over Olsen, except for Section 18-109, accordingly, I limit my analysis to that statute.

The Plaintiffs' argument that Olsen materially participated in managing Akrimax suffers from the same fatal flaw as the Plaintiffs' argument that Mazur materially participated in managing Akrimax after July 1, 2013. In short, the Plaintiffs fail to allege that Olsen had control of, or had a decision making role, in Akrimax. Viewing the record in the light most favorable to the Plaintiff, as I must, I assume Olsen helped to run day-to-day operations, including managing the sales force, responding to information requests from directors, and executing agreements that Akrimax had entered into with other entities. Olsen was an employee. However, the Plaintiffs do not allege that Olsen performed his duties as President and CEO independently of the manager of Akrimax;[312] instead, the facts pled

---

[310] *Id.* at 6.

[311] *Id.* at 7–8. The Amended Complaint barely mentions Olsen's role at Akrimax, aside from providing misleading financial information to Laumas. However, the Plaintiffs have supplemented this account with information from preliminary discovery and affidavits.

[312] Akrimax's manager was the entire board before July 1, 2013, and solely Krivulka after that date.

indicate that Olsen performed his duties subject to the control of the "emperor," Akrimax's manager, Krivulka.

As previously mentioned in relation to Mazur's Motion to Dismiss under Rule 12(b)(2), the Plaintiffs have repeatedly emphasized the complete control of Krivulka over Akrimax. The Plaintiffs allege that Olsen implemented the terms of agreements that *Krivulka* caused Akrimax to enter into, such as Akrimax's agreements with Cranford Pharmaceuticals and Holmdel Pharmaceuticals. The fact that Olsen, the president and CEO of Akrimax, implemented agreements that Akrimax had entered into is not remarkable, nor is it a sign of control over those agreements. The Plaintiffs also allege that Olsen at first refused to provide any financial information to Laumas and then gave him information that the Plaintiffs contend was misleading. However, the Plaintiffs themselves acknowledge that Olsen asked Krivulka *how Krivulka wanted* Olsen to respond to Laumas's requests,[313] and then acted accordingly.

Olsen was certainly an officer of Akrimax, and as an officer his responsibilities were broad and included day-to-day operations. Such participation can be material; for example, in *Phillips v. Hove*, this Court found that a defendant who took over all day-to-day operations and effectively ran the LLC at issue,

---

[313] Pls.' Br. in Opp'n to Defs. Olsen's, Mazur's, and LMazur's Mots. to Dismiss and in Opp'n to the Mazur Defs.' Mot. for Partial Summ. J., at 5-6.

including filing legal petitions on its behalf, had materially participated in the LLC's management.[314] Contrary to *Phillips*, however, here the Plaintiffs have specifically pled the complete control of Akrimax by Krivulka. In *Phillips*, by contrast, there was no manager in place when the defendant *took* and exercised control, and effectively became the manager.[315] The Plaintiffs have failed to plead facts that, if true, show that Olsen had the requisite control or a decision making role required to show material participation, or that Olsen ever attempted to take any action outside of the control of the manager. As a result, Olsen is not a manager as defined in 6 Del. C. § 18-109. The Plaintiffs have cited no other basis for exercising personal jurisdiction over Olsen. Olsen's Motion to Dismiss pursuant to Rule 12(b)(2) is granted.[316]

### D. The Remaining Rule 12(b)(6) Motions

As described above, LMazur Associates and Olsen are dismissed from this action for lack of personal jurisdiction. I have also stayed the claim for breach of restrictive covenants pending the decision of the arbitrator. The remaining parties also seek dismissal of all claims brought against them under Rule 12(b)(6). I issued Celestial I on January 31, 2017, in which I interpreted Akrimax's LLC operating agreement as of July 1, 2013; I note that the language eliminating fiduciary duties as

---

[314] 2011 WL 4404034 (Del. Ch. Sept. 22, 2011).
[315] *Id.* at *22.
[316] Accordingly, I need not reach Olsen's argument on insufficiency of service of process.

of July 1, 2013 appears materially unchanged from the Second Amended LLC Agreement the parties entered into on January 11, 2008. The parties subsequently entered into mediation; after mediation failed, in a January 31, 2018 scheduling conference I asked the parties to submit letters detailing what Motions to Dismiss remained pending and how Celestial I bears on the Motions to Dismiss. The responses I received lacked the specificity to be useful to me. Following these efforts, Krivulka passed away, and the parties tried, but again failed, to resolve this action outside of litigation. The remaining parties shall, again in light of Celestial I and in light of this Memorandum Opinion, inform me what remains of the Motions to Dismiss, specifically as to counts and parties.[317]

---

[317] For instance, and as just noted, I found in Celestial I that, at least as of July 1, 2013, Akrimax's LLC operating agreement "generally eliminates common-law fiduciary duties except that it retains liability for intentional or illegal misconduct and other bad faith actions, as well as for improper self-dealing. Those duties are contractual in nature . . . ." *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017). The Plaintiffs allege in the Amended Complaint that Cranford Pharmaceuticals and Holmdel Pharmaceuticals aided and abetted a breach of fiduciary duty. Am. Compl. ¶ 193. The Amended Complaint also contained a claim for bad faith breach of fiduciary duty brought "against Krivulka and *All Defendants*;" however, the Plaintiffs now contend that they "do not assert a direct breach of fiduciary claim against Cranford Pharmaceuticals, LLC and Holmdel Pharmaceuticals, LP . . . ." *See* Am. Compl., at 54 (emphasis added); Pls.' Br. in Opp'n to Cranford and Holmdel's Mots. to Dismiss, at 11. Akrimax's operating agreement, at least as of July 1, 2013, eliminated common law fiduciary duties and left only contractual fiduciary duties. And "Delaware law . . . 'does not recognize a claim for aiding and abetting a breach of contract.'" *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *17 (Del. Ch. July 6, 2018) (quoting *Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013)). In *Wenske*, for example, this Court, in the LPA context, found that the plaintiff failed to state a claim for aiding and abetting a breach of "contractual fiduciary duties" because the claim advanced "is, in substance, a claim for aiding and abetting a breach of contract," which is not recognized by Delaware law. 2013 WL 209658, at *2, 17. It would be helpful to know if, and on what grounds, the Plaintiffs maintain that the aiding and abetting claims survive. *Ditto*, with respect to the other equitable claims asserted against entities other than Krivulka or his estate.

## III. CONCLUSION

The Plaintiffs' claims for breach of restrictive covenants are stayed pending the arbitrator's decision on arbitrability. Furthermore, this Court lacks personal jurisdiction over LMazur Associates (pending the arbitrator's decision) and Olsen. I reserve judgment on the balance of the Motions to Dismiss, as explained above.